# OHIO BUREAU OF EMPLOYMENT SERVICES
## ET AL. *v.* HODORY

No. 75–1707.   Argued February 28, 1977—Decided May 31, 1977

*Richard A. Szilagyi,* Assistant Attorney General of Ohio, argued the cause for appellants. With him on the briefs was *William J. Brown,* Attorney General.

*T. Patrick Lordeon* argued the cause for appellee. With him on the brief were *Robert M. Clyde, Jr.,* and *Fred A. Culver.**

Mr. Justice Blackmun delivered the opinion of the Court.

This case presents a challenge to Ohio Rev. Code Ann. § 4141.29 (D)(1)(a) (1973). That statute, at the times rele-

---

*Briefs of *amici curiae* urging reversal were filed by *Gerard C. Smetana, Jerry Kronenberg, Julian D. Schreiber, Lawrence B. Kraus,* and *Richard O'Brecht* for the Chamber of Commerce of the United States; and by *Frank C. Manak* for the United States Steel Corp.

*J. Albert Woll* and *Laurence Gold* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance.

*Walter J. Mackey* filed a brief for the Republic Steel Corp. as *amicus curiae.*

vant to this suit, imposed a disqualification for unemployment benefits when the claimant's unemployment was "due to a labor dispute other than a lockout at any factory . . . owned or operated by the employer by which he is or was last employed." The challenge is based on the Supremacy Clause and on the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The case also raises questions concerning abstention.

## I

In November 1974 plaintiff-appellee, Leonard Paul Hodory, was employed as a millwright apprentice with United States Steel Corporation (USS) at its works in Youngstown, Ohio. The United Mine Workers at that time were out on strike at coal mines owned by USS and by Republic Steel Corporation throughout the country. These company-owned mines supplied the fuel used in the operation of manufacturing facilities of USS and Republic. As a result of the strike, the fuel supply at the Youngstown plant was reduced. The plant eventually was shut down, and appellee was furloughed on November 12, 1974.

Hodory applied to appellant Ohio Bureau of Employment Services for unemployment benefits. On January 3, 1975, he was notified by the Bureau that his claim was disallowed under Ohio Rev. Code Ann. § 4141.29 (D)(1)(a) (1973). That statute then provided that a worker may not receive unemployment benefits if

> "[h]is unemployment was due to a labor dispute other than a lockout at any factory, establishment, or other premises located in this or any other state and owned or operated by the employer by which he is or was last employed; and for so long as his unemployment is due to such labor dispute." [1]

---

[1] In December 1975, § 4141.29 (D)(1)(a) (1973), was amended to read: "(D) Notwithstanding division (A) of this section, no individual may serve a waiting period or be paid benefits under the following conditions:

The written notification to appellee recited: "A labor dispute started at coal mines owned and operated by U. S. Steel Corporation and claimant is unemployed because of this labor dispute." App. i. Other notifications to Hodory for subsequent unemployment weeks contained similar recitals. *Id.,* at ii and iii. Appellee promptly filed a request for reconsideration. In accord with the provisions of Ohio Rev. Code Ann. § 4141.28 (G) (1973), his request, along with a number of others, was referred on March 7 to the Board of Review.[2]

---

"(1) For any week with respect to which the administrator finds that:

"(a) His unemployment was due to a labor dispute other than a lockout at any factory, establishment, or other premises located in this or any other state and owned or operated by the employer by which he is or was last employed; and for so long as his unemployment is due to such labor dispute. No individual shall be disqualified under this provision if: (i) his employment was with such employer at any factory, establishment, or premises located in this state, owned or operated by such employer, other than the factory, establishment, or premises at which the labor dispute exists, if it is shown that he is not financing, participating in, or directly interested in such labor dispute, or, (ii) his employment was with an employer not involved in the labor dispute but whose place of business was located within the same premises as the employer engaged in the dispute, unless his employer is a wholly owned subsidiary of the employer engaged in the dispute, or unless he actively participates in or voluntarily stops work because of such dispute. If it is established that the claimant was laid off for an indefinite period and not recalled to work prior to the dispute, or was separated by the employer prior to the dispute for reasons other than the labor dispute, or that he obtained a bona fide job with another employer while the dispute was still in progress, such labor dispute shall not render the employee ineligible for benefits." Act (amended substitute Senate bill 173) effective Dec. 2, 1975.

The amendment added subdivision (i). Thus it is possible that if appellee's furlough had been effected after December 2, 1975, he would qualify for benefits. We are advised, however, that the amendment is not retroactive. Tr. of Oral Arg. 16.

[2] Appellants state that these referrals are still before the Board of Review but are stayed pending decision in this case. Brief for Appellants 4.

Meanwhile, on January 27, Hodory filed a complaint in the United States District Court for the Northern District of Ohio against the Bureau and its director, Albert G. Giles. The complaint was based on 42 U. S. C. § 1983 and sought declaratory and injunctive relief on behalf of appellee and "all others similarly situated" who had been or in the future would be denied benefits under § 4141.29 (D)(1)(a). Record, Doc. 3, pp. 1 and 3. Hodory asserted, among other things, that the Ohio statute was in conflict with §§ 303 (a)(1) and (3) of the Social Security Act of 1935, as amended, 42 U. S. C. §§ 503 (a)(1) and (3), and that the statute as applied was irrational and had no valid public purpose, in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment.[3] The gravamen of Hodory's complaint was the assertion that the State may not deny benefits to those who, like him, are unemployed under circumstances where the unemployment is "not the fault of the employee." A three-judge court was requested.

Appellants in their answer asserted, among other things, that Hodory had failed to exhaust his state administrative remedies.

A three-judge court was convened. The case was tried on the pleadings and interrogatories. In its opinion filed March 5, 1976, 408 F. Supp. 1016, that court concluded that abstention was not required and would not be proper; that the action was properly maintained as a class action;[4]

---

[3] At no point in this litigation has appellee claimed that § 4141.29 (D) (1)(a) conflicts with or is pre-empted by any provision of the National Labor Relations Act, 29 U. S. C. § 151 *et seq.* We do not today consider or decide the relationship between that Act and a statute such as § 4141.29 (D)(1)(a).

[4] The District Court determined, however, that the class as defined by appellee in his complaint was overbroad. The court in its turn defined the class as "Hodory and approximately 1250 members of the United Steelworkers in Ohio, who became unemployed through no fault of their

and that the appellants had failed to demonstrate a rational and legitimate interest in discriminating against "individuals who were unemployed through no fault of their own and neither participated in nor benefited from the labor dispute involving another union and their employer." *Id.*, at 1022. The court then held that § 4141.29 (D)(1)(a), as applied to Hodory and the class members, violated the Equal Protection and Due Process Clauses.

The Bureau and its director took a direct appeal here pursuant to 28 U. S. C. § 1253. In their jurisdictional statement appellants argued only that (1) the "labor dispute" disqualification provision is not unconstitutional as applied to appellee and the class; (2) the disqualification provision is not in conflict with the Social Security Act; (3) a state system of unemployment compensation may predicate disqualification upon any reasonable basis; and (4) USS and Republic, as employers of the class members, were denied substantive and procedural due process by the failure of the District Court to order them joined as parties defendant.[5] Appellants made no claim therein based on abstention. We noted probable jurisdiction. 429 U. S. 814 (1976).

A claim that the District Court should have abstained from deciding the case has been raised, however, in the brief *amicus curiae* filed by the AFL–CIO. A like claim is at least sug-

---

own, [and] were denied unemployment benefits by defendants for a specific period of time because of the labor dispute disqualification clause in § 4141.29 (D)(1)(a), despite the fact that they may have been qualified in all other respects to receive the benefits." 408 F. Supp., at 1020. Members of this class included Hodory's fellow workers at USS and also employees of Republic Steel who were furloughed as a result of the strike at Republic's coal mines.

[5] In view of our disposition of the case, we have no reason to reach this constitutional claim. USS and Republic each sought to intervene for purposes of taking an appeal here, and as parties in this Court. These motions were denied. See 429 U. S. 814 (1976).

gested by Republic Steel. Brief as *Amicus Curiae* 16–17. We feel those claims merit consideration.

We follow the proper course for federal courts by considering first whether abstention is required, then whether there is a statutory ground of resolution, and finally, only if the challenge persists, whether the statute violates the Constitution.

## II

## Abstention

There are, of course, two primary types of federal abstention. The first, usually referred to as *Pullman* abstention, involves an inquiry focused on the possibility that the state courts may interpret a challenged state statute so as to eliminate, or at least to alter materially, the constitutional question presented. *Railroad Comm'n* v. *Pullman Co.*, 312 U. S. 496 (1941). See *Bellotti* v. *Baird,* 428 U. S. 132 (1976). The second type is *Younger* abstention, in which the court is primarily concerned, in an equitable setting, with considerations of comity and federalism, both as they relate to the State's interest in pursuing an ongoing state proceeding, and as they involve the ability of the state courts to consider federal constitutional claims in that context. *Younger* v. *Harris,* 401 U. S. 37 (1971). See *Huffman* v. *Pursue, Ltd.,* 420 U. S. 592 (1975); *Juidice* v. *Vail,* 430 U. S. 327 (1977); *Trainor* v. *Hernandez, ante,* at 448 (concurring opinion).

A. In the present case, appellants, who in effect are the State of Ohio, argued before the District Court that appellee was free to pursue his pending administrative appeal and have his constitutional claim adjudicated in the Court of Common Pleas, and that principles of comity therefore required abstention.[6] Although appellants in their written submission

---

[6] Brief in Opposition to Jurisdiction (of the District Court), Record, Doc. 8. The defendants-appellants explicitly stated that an appeal would lie to the Court of Common Pleas. *Id.,* at 2. It appears that the Board

to that court cited *Pullman,* the argument was clearly to the effect that *Younger* abstention should apply.[7]

The District Court held that abstention was unwarranted. It first asserted that in *Gibson* v. *Berryhill,* 411 U. S. 564 (1973), this Court "stated specifically that administrative remedies need not be exhausted where the federal court plaintiff states a good cause of action under 42 U. S. C. § 1983." 408 F. Supp., at 1019.[8] The court then stated that § 4141.29 (D)(1)(a), "on its face, would appear to except the plaintiff from unemployment benefits for the period he was laid off due to coal miners' strike," and that "the Employment Bureau has denied benefits to plaintiff . . . solely on the basis of the challenged labor dispute disqualification." 408 F. Supp., at 1019. The court held that exhaustion of administrative remedies would be futile because the administrative appeal process would not permit a challenge to the constitutionality of the statute, and the Ohio courts had held the statute to be constitutional. *Id.,* at 1019, and n. 1. Although the court observed that *Huffman* v. *Pursue, Ltd., supra,* broadened the *Younger* doctrine "to include a prohibition against federal court interference with certain ongoing *civil* proceedings in the state

---

might give appellee's class claim special treatment so as to render the Board's decision eligible for direct review by the Supreme Court of Ohio. Ohio Rev. Code Ann. § 4141.28 (N) (1973) (claims involving more than 500 persons). Neither appellee nor appellants suggest, however, that the Board is considering such action.

[7] This is confirmed by the fact that *Younger* abstention was the sole abstention principle argued orally before the District Court. Record, Doc. 35, pp. 5–12, 27–29, and 47–49.

[8] In *Gibson* v. *Berryhill* this Court actually held, however, that the *Younger* rule "or the principles of equity, comity, and federalism" for which it stands, 411 U. S., at 575, did not require the dismissal of that § 1983 suit in view of a proceeding then pending before a state Board of Optometry, since it was alleged, and the District Court there had concluded, that the Board's bias rendered it incompetent to adjudicate the issues. 411 U. S., at 575–577.

courts," 408 F. Supp., at 1019–1020, the court held that *Huff-man* "was limited to the enjoining of ongoing state-initiated *judicial* proceedings," 408 F. Supp., at 1020 (emphasis in original), and did not apply to a challenge to administrative actions. Finally, the court held that abstention, along the *Pullman* line, "would not be proper in this case" because the challenged statute is not an ambiguous one "involving unsettled questions of state law which could be rendered constitutionally inoffensive by a limiting construction in the state courts." 408 F. Supp., at 1020. The court concluded that it would be improper to require the appellee "to undertake three administrative appeals" [9] before he could challenge the statute in state court "where, moreover, the issue as to the constitutionality of the labor dispute disqualification has apparently been settled." *Ibid.*

In this Court, as has been noted, appellants have not argued that *Younger* requires a remand with directions to the District Court to abstain, and at oral argument they resisted the suggestion of such a remand. Tr. of Oral Arg. 9–10. Instead, it is *amicus* Republic Steel that has made the suggestion.

*Younger* v. *Harris* reflects "a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." 401 U. S., at 44. See *Huffman* v. *Pursue, Ltd.*, 420 U. S., at 604; *Juidice* v. *Vail*, 430 U. S., at 334; *Trainor* v. *Hernandez, ante,* at 441–443, 445–446, and *id.*, at 448 (concurring opinion). *Younger* and these cited cases express equitable principles of comity and federalism. They are designed to allow the State an opportunity to "set its own

---

[9] The nature of the three appeals is not made clear. It is possible that a more expeditious route was available. See n. 6, *supra.*

house in order" when the federal issue is already before a state tribunal.

It may not be argued, however, that a federal court is compelled to abstain in every such situation. If the State voluntarily chooses to submit to a federal forum, principles of comity do not demand that the federal court force the case back into the State's own system. In the present case, Ohio either believes that the District Court was correct in its analysis of abstention or, faced with the prospect of lengthy administrative appeals followed by equally protracted state judicial proceedings, now has concluded to submit the constitutional issue to this Court for immediate resolution. In either event, under these circumstances *Younger* principles of equity and comity do not require this Court to refuse Ohio the immediate adjudication it seeks.[10]

B. *Amicus* AFL–CIO argues that *Pullman* abstention is proper here.[11] The basis for the claimed applicability of *Pullman* is found in the facts that there were other steelworkers, at other Ohio facilities, laid off at the same time as appellee and assertedly for the same reason, and yet they were awarded unemployment compensation by the Bureau. See Brief for Appellants 3. Benefits were granted on the ground that the company-owned coal mines did not supply a sufficient amount of fuel to the plants there involved to effect a plant shutdown.[12] *Amicus* argues that if appellee

---

[10] In view of this conclusion, we need not and do not express any view on whether the District Court erred in refusing to abstain on *Younger* grounds.

[11] *Pullman* abstention, where deference to the state process may result in elimination or material alteration of the constitutional issue, surely does not require that this Court defer to the wishes of the parties concerning adjudication. See *Railroad Comm'n v. Pullman Co.*, 312 U. S. 496 (1941).

[12] It appears that the steel companies have taken an appeal from that ruling by the Bureau to the Board of Review, but decision of that appeal has been withheld pending resolution of the instant case. See Brief for AFL–CIO as *Amicus Curiae* 5 n. 3.

were to pursue his administrative appeal, he might be granted benefits on the same ground.

The problems with this approach, however, are several. First, appellee did not press any such claim before the Bureau or on administrative appeal, Tr. of Oral Arg. 9, and there is no indication that a claimant may be awarded benefits on the basis of a claim not made to the Bureau or Board of Review. Second, there is no indication that the plant at which appellee worked is situated similarly to the plants as to which benefits were granted. The Bureau apparently applied a test under which the closing of a plant was held not to be "due to" the labor dispute if the plant received less than 50% of its coal from the employer's struck mines. *Id.*, at 7–8. There has been no claim or showing that the 50% test is unreasonable or improper and there has been no claim that appellee's plant was not dependent on the struck mines for more than 50% of its coal. What *amicus* suggests is that the court abstain on the basis of speculation that the unchallenged facts may not be as the Bureau obviously saw them, or that the Board might overturn an unchallenged standard of causation, or that the Board might even come up with a hitherto unknown and unclaimed reason for awarding benefits to appellee, such as a theory that because the coal strike was nationwide it was not " 'at the employers' mines.' " See Brief for AFL–CIO as *Amicus Curiae* 8.

None of these suggestions is based on fact or solid legal precedent. As has been noted, *Pullman* abstention is an equitable doctrine that comes into play when it appears that abstention may eliminate or materially alter the constitutional issue presented. There is a point, however, at which the possible benefits of abstention become too speculative to justify or require avoidance of the question presented. That point has been reached and surpassed here. We conclude that *Pullman* abstention is not appropriate.

## III

### Pre-emption

Appellee argues that the Ohio statute is in conflict with, or pre-empted by, certain provisions of the Social Security Act, 42 U. S. C. § 501 *et seq.,* and the Federal Unemployment Tax Act, 26 U. S. C. §§ 3301–3311. This argument was raised in the District Court but was not resolved there. It would have been preferable, of course, for that court to have dealt with this statutory issue first. See *Hagans* v. *Lavine,* 415 U. S. 528, 543–545 (1974). The issue, however, entails no findings of fact and has been fully briefed here by both parties. We therefore perceive no need to remand to the District Court, and we proceed to decide the question.

Appellee points to two statutes as the source of his claimed federal requirement that he be paid unemployment compensation. The first is 42 U. S. C. § 503 (a)(1), to the effect that the Secretary of Labor shall make no certification for payment of federal funds to state unemployment compensation programs unless state law provides for such methods of administration "as are found by the Secretary of Labor to be reasonably calculated to insure full payment of unemployment compensation when due." Appellee's argument necessarily is that payment is "due" him.

Appellee cites only a single page of the voluminous legislative history of the Social Security Act in support of his assertion that the Act forbids disqualification of persons laid off due to a labor dispute at a related plant. That page contains the sentence: "To serve its purposes, unemployment compensation must be paid only to workers involuntarily unemployed." Report of the Committee on Economic Security, as reprinted in Hearings on S. 1130 before the Senate Committee on Finance, 74th Cong., 1st Sess., 1311, 1328 (1935).

The cited Report was one to the President of the United States and became the cornerstone of the Social Security Act. On its face, the quoted sentence may be said to give

some support to appellee's claim that "involuntariness" was intended to be the key to eligibility. A reading of the entire Report and consideration of the sentence in context, however, show that Congress did not intend to require that the States give coverage to every person involuntarily unemployed.

The Report recognized that federal definition of the scope of coverage would probably prove easier to administer than individualized state plans, *id.*, at 1323, but it nonetheless recommended the form of unemployment compensation scheme that exists today, namely, federal involvement primarily through tax incentives to encourage state-run programs. The Report's section entitled "Outline of Federal Act" concludes with the statement:

> "The plan for unemployment compensation that we suggest contemplates that the States shall have broad freedom to set up the type of unemployment compensation they wish. We believe that all matters in which uniformity is not absolutely essential should be left to the States. The Federal Government, however, should assist the States in setting up their administrations and in the solution of the problems they will encounter." *Id.*, at 1326.

See also *id.*, at 1314.

Following this statement, the Report contains a section entitled "Suggestions for State Legislation." It reads:

> "*Benefits.*—The States should have freedom in determining their own waiting periods, benefit rates, maximum-benefit periods, etc. We suggest caution lest they insert benefit provisions in excess of collections in their laws. To arouse hopes of benefits which cannot be fulfilled is invariably bad social and governmental policy." *Id.*, at 1327.

This statement reflects two things. First, it reflects the understanding that unemployment compensation schemes

generally do not grant full benefits immediately and indefinitely, even to those involuntarily unemployed. The States were expected to create waiting periods, benefit rates, and maximum-benefit periods, so as to bring the amount paid out in line with receipts. Second, the statement reflects concern that the States might grant eligibility greater than their funds could handle.

By way of advice on particular statutes, the Report's "Suggestions" contains the following:

> "*Willingness-to-work test.*—To serve its purposes, unemployment compensation must be paid only to workers involuntarily unemployed. The employees compensated must be both able and willing to work and must be denied benefits if they refuse to accept other suitable employment. Workers, however, should not be required to accept positions with wage, hour, or working conditions below the usual standard for the occupation or the particular region, or outside of the State, or where their rights of self-organization and collective bargaining would be interfered with." *Id.,* at 1328.

This, as has been noted, is the origin of appellee's argument that all persons involuntarily unemployed were intended to be compensated. Placed in context, however, it is clear that the single sentence is only an expression of caution that funds should not be dispensed too freely, and is not a direction that funds must be dispensed.

Appellee's claim of support in the legislative history accordingly fails. Indeed, that history shows, rather, that Congress did not intend to restrict the ability of the States to legislate with respect to persons in appellee's position. See also H. R. Rep. No. 615, 74th Cong., 1st Sess., 8–9 (1935); S. Rep. No. 628, 74th Cong., 1st Sess., 12–13 (1935).

Appellee would find support in the "labor dispute disqualification" contained in § 5 (d) of draft bills issued by the Social Security Board shortly after passage of the Social Se-

curity Act. Social Security Board, Draft Bills for State Unemployment Compensation of Pooled Fund and Employer Reserve Account Types (1936).[13] Appellee argues that this proposed section evinced an intention that "innocent" persons not be disqualified from unemployment compensation. The Social Security Board, however, on the cover page of the draft bills booklet explicitly stated:

> "These drafts are merely suggestive . . . . Therefore, they cannot properly be termed 'model' bills or even recommended bills. This is in keeping with the policy of the Social Security Board of recognizing that it is the final responsibility and the right of each state to determine for itself just what type of legislation it desires and how it shall be drafted."

We therefore are most reluctant to read implications of the draft bills into the Social Security Act.

More important, however, appellee's argument fails on its face. The draft bills themselves denied "innocents" certain compensation. They did so not only in the various provisions

---

[13] Section 5 (d) of those bills provided that a claimant is disqualified:

"For any week in which it is found by the commission that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises at which he is or was last employed, provided that this subsection shall not apply if it is shown to the satisfaction of the commission that:

"1. He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and

"2. He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute;

"and provided further that if in any case separate branches of work, which are commonly conducted as separate businesses in separate premises, are conducted in separate departments of the same premises, each such department shall for the purposes of this subsection be deemed to be a separate factory, establishment or other premises."

as to minimum time spent at the job, waiting periods, and maximum benefits, but also in the labor dispute disqualification itself. The labor dispute provisions are triggered by a dispute at the same "establishment" and they disqualify any member of a "grade or class of workers" any of whose members were interested in the dispute. As the commentary and case law in jurisdictions that adopted versions of the draft bills immediately recognized, this division could serve to disqualify even a person who actively opposed a strike and could extend to persons laid off because of a dispute at another plant owned by the same employer.[14]

The law that appellee challenges is different in form from the draft bills, but we cannot say that it is qualitatively different. We do not find in the draft bills any significant support for appellee's argument that the Social Security Act forbids his disqualification from benefits.

Appellee also claims support from this Court's decision in *California Human Resources Dept.* v. *Java,* 402 U. S. 121 (1971). In that case the Court held that the requirement of 42 U. S. C. § 503 (a)(1) that payments be made "when due" forbids suspension of payments during an appeal subsequent to a full consideration on the merits. Appellee relies on the Court's statement: "The objective of Congress was to provide a substitute for wages lost during a period of unemployment not the fault of the employee." 402 U. S., at 130. Appellee argues that this statement is a holding that the Act forbids disqualification of persons in his position. We do not agree. Nothing in *Java* purported to define the class of persons eli-

---

[14] See Fierst & Spector, Unemployment Compensation in Labor Disputes, 49 Yale L. J. 461 (1940); Haggart, Unemployment Compensation During Labor Disputes, 37 Neb. L. Rev. 668 (1958); Shadur, Unemployment Benefits and the "Labor Dispute" Disqualification, 17 U. Chi. L. Rev. 294 (1950); Comment, Labor Dispute Disqualification Under the Ohio Unemployment Compensation Act, 10 Ohio St. L. J. 238 (1949), and cases cited therein. See generally Annot., 63 A. L. R. 3d 88 (1975).

gible for benefits. The Court's sole concern there was with the treatment of those who already had been determined under state law to be eligible.

Finally, appellee argues that statements in the legislative history of the Employment Security Amendments of 1970, 84 Stat. 695, indicate a congressional understanding that persons in his position must not be disqualified. These statements (identical in both House and Senate Reports) relate to the amendment prohibiting States from canceling accumulated wage credits on grounds such as an employee's change of jobs.[15] The statements are concerned with a situation unrelated to the one in which appellee finds himself. To the extent that they might be seen as shedding light on the area, they are far from persuasive authority in appellee's favor, since they recognize that the States continue to be free to disqualify a claimant whose unemployment is due to a labor dispute "in the worker's plant, etc."

---

[15] The statements read:

"The provision [forbidding cancellation] would not restrict State authority to prescribe the conditions under which a claimant would be 'otherwise eligible.' For example, benefits are not now—and would not under the proposal be—paid for a week of unemployment unless the claimant were available for work. It would not prevent a State from specifying the conditions for disqualification such as, for refusing suitable work, for voluntary quitting, for unemployment due to a labor dispute in the worker's plant, etc. . . .

.      .       .        .         .

"Your [in the Senate report this word is 'the'] committee believes that the disqualification provisions of State unemployment compensation laws should be devised so as to prevent benefit payments to those responsible for their own unemployment, without undermining the basic objective of the unemployment insurance system—to provide an income floor to those whose unemployment is beyond their control. Severe disqualifications, particularly those which cancel earned monetary entitlement, are not in harmony with the basic purposes of an unemployment insurance system." H. R. Rep. No. 91–612, pp. 18–19 (1969); S. Rep. No. 91–752, pp. 23–24 (1970).

As an alternative or addition to his argument based on the Social Security Act, appellee urges that the Federal Unemployment Tax Act, 26 U. S. C. §§ 3301–3311, as amended, shows "congressional intent to pre-empt the state, particularly with respect to the scope of inclusiveness in the unemployment program." Brief for Appellee 13. We do not understand appellee to argue that the States are pre-empted by the Federal Unemployment Tax Act from imposing any sort of labor dispute disqualification. If total pre-emption is not claimed, we find nothing in any of appellee's citations that would show pre-emption in the particular area of concern to him. Indeed, study of the various provisions cited shows that when Congress wished to impose or forbid a condition for compensation, it was able to do so in explicit terms.[16] There are numerous examples, in addition to the one set forth in n. 16, less related to labor disputes but showing congressional ability to deal with specific aspects of state plans.[17] The fact that Congress has chosen not to legislate on the subject of labor dispute disqualifications confirms our belief that neither the

------

[16] See, for example, 26 U. S. C. § 3304 (a) (5), which from the start has provided:

"(5) compensation shall not be denied in such State to any otherwise eligible individual for refusing to accept new work under any of the following conditions:

"(A) if the position offered is vacant due directly to a strike, lockout, or other labor dispute;

"(B) if the wages, hours, or other conditions of the work offered are substantially less favorable to the individual than those prevailing for similar work in the locality;

"(C) if as a condition of being employed the individual would be required to join a company union or to resign from or refrain from joining any bona fide labor organization."

[17] See Employment Security Amendments of 1970, 84 Stat. 695; Emergency Unemployment Compensation Act of 1971, 85 Stat. 811; Emergency Unemployment Compensation Act of 1974, 88 Stat. 1869; Unemployment Compensation Amendments of 1976, 90 Stat. 2667.

Social Security Act nor the Federal Unemployment Tax Act was intended to restrict the States' freedom to legislate in this area.

## IV

### Constitutionality

We come, then, to the question whether the Ohio labor dispute disqualification provision is constitutional. The statute does not involve any discernible fundamental interest or affect with particularity any protected class. Appellee concedes that the test of constitutionality, therefore, is whether the statute has a rational relation to a legitimate state interest. Brief for Appellee 29. See *New Orleans* v. *Dukes,* 427 U. S. 297 (1976). Our statement last Term in *Massachusetts Bd. of Retirement* v. *Murgia,* 427 U. S. 307 (1976), explains the analysis:

> "We turn then to examine this state classification under the rational-basis standard. This inquiry employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor necessary. *Dandridge* v. *Williams,* [397 U. S. 471,] 485 [(1970)]. Such action by a legislature is presumed to be valid." *Id.,* at 314.

Appellee challenges the statute only in its application to persons in his situation. We find it difficult, however, to discern the precise nature of the situation that appellee claims may not be the subject of disqualification. His discussion focuses to a great extent on his claim that he is "involuntarily unemployed," but he cannot be arguing that no person involuntarily unemployed may be disqualified, for he approves the draft bills' labor dispute provision. Brief for Appellee 53. That provision, as discussed above, would disqualify an involuntarily unemployed nonunion worker who opposed a strike

but whose grade or class of workers nevertheless went out on strike.

Appellee's claim of irrationality appears to be based, rather, on his view of the statute's broad sweep, in that it disqualifies an individual "regardless of the geographical remoteness of the location of the dispute, and regardless of any arguable actual, or imputable, participation or direct interest in the dispute on the part of the disqualified person." [18] *Id.*, at 34. Appellee thus focuses on the interests of the recipient of unemployment compensation.

The unemployment compensation statute, however, touches upon more than just the recipient. It provides for the creation of a fund produced by contributions from private employers. The rate of an employer's contribution to the fund varies according to benefits paid to that employer's eligible employees. Ohio Rev. Code Ann. § 4141.25 (1973). Any action with regard to disbursements from the unemployment compensation fund thus will affect both the employer and the fiscal integrity of the fund. Appellee in effect urges that the Court consider only the needs of the employee seeking compensation. The decision of the weight to be given the various effects of the statute, however, is a legislative decision, and appellee's position is contrary to the principle that "the Fourteenth Amendment gives the federal courts no power to impose upon the States their views of what constitutes wise economic or social policy." *Dandridge* v. *Williams,* 397 U. S. 471, 486

---

[18] Appellee also claims that § 4141.29 (D) (1) (a) creates an impermissible "irrebuttable presumption." This argument requires two assumptions. First, appellee must assume that the only purpose of the statute is to measure "innocence." Then he must assume that the disqualification provision represents a presumption that any person laid off due to a strike is not innocent. If the statute is designed to serve any purpose other than measuring innocence, appellee's implication of an irrebuttable presumption fails. As we discuss below, the statute clearly has purposes other than measuring the innocence of the disqualified worker.

(1970). In considering the constitutionality of the statute, therefore, the Court must view its consequences, not only for the recipient of benefits, but also for the contributors to the fund and for the fiscal integrity of the fund.

Looking only at the face of the statute, an acceptable rationale immediately appears. The disqualification is triggered by "a labor dispute other than a lockout." In other words, if a union goes on strike, the employer's contributions are not increased, but if the employer locks employees out, all his employees thus put out of work are compensated and the employer's contributions accordingly are increased. Although one might say that this system provides only "rough justice," its treatment of the employer is far from irrational. "If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61, 78." *Dandridge* v. *Williams,* 397 U. S. at 485. The rationality of this treatment is, of course, independent of any "innocence" of the workers collecting compensation.

Appellants assert three additional rationales for the disqualification provision. First, they argue that granting benefits to workers laid off due to a strike at a parent company's subsidiary plant in effect would be subsidizing the union members. Brief for Appellants 12. The District Court correctly rejected this rationale, as applied to appellee and his class, because payments to appellee would in no way directly subsidize the striking coal miners, and the fact that appellee happened to be a member of a union (other than the striking union) is not a legitimate reason, standing alone, to deny him benefits. 408 F. Supp., at 1022. The court continued:

"Moreover, close scrutiny of the reasons for the State's classification reveals that what the state is actually intend-

ing to prevent is not the 'subsidizing' of unemployed *union members* per se, but the subsidizing of union-initiated work stoppages" (emphasis in original). *Ibid.*

This statement of the State's purpose reflects its second proffered justification, namely, that the granting of benefits would place the employer at an unfair disadvantage in negotiations with the unions. The District Court rejected this justification on the grounds that payments of funds to the steelworkers

"could hardly be deemed to put the coal miners in a position to refuse to negotiate with the steel companies until the companies reached a financial crisis, thereby causing the companies to yield to the unreasonable and economically unsound demands of the coal miners to prevent bankruptcy." *Ibid.*

Although the District Court was reacting to appellants' own hyperbole in speaking of financial crises and bankruptcy, it must be recognized that effects less than pushing the employer to bankruptcy may be rationally viewed as undesirable. The employer's costs go up with every laid-off worker who is qualified to collect unemployment. The only way for the employer to stop these rising costs is to settle the strike so as to return the employees to work. Qualification for unemployment compensation thus acts as a lever increasing the pressures on an employer to settle a strike. The State has chosen to leave this lever in existence for situations in which the employer has locked out his employees, but to eliminate it if the union has made the strike move. Regardless of our views of the wisdom or lack of wisdom of this form of state "neutrality" in labor disputes, we cannot say that the approach taken by Ohio is irrational.

The third rationale offered by the State is its interest in protecting the fiscal integrity of its compensation fund. This has been a continuing concern of Congress and the States with regard to unemployment compensation systems. See Report

of the Committee on Economic Security, cited *supra,* at 482; Hearing on H. R. 6900 before the Senate Committee on Finance, 94th Cong., 1st Sess. (1975). It is clear that protection of the fiscal integrity of the fund is a legitimate concern of the State. We need not consider whether it would be "rational" for the State to protect the fund through a random means, such as elimination from coverage of all persons with an odd number of letters in their surnames. Here, the limitation of liability tracks the reasons found rational above, and the need for such limitation unquestionably provides the legitimate state interest required by the equal protection equation.

The District Court's opinion contains a paragraph declaring that, in addition to violating the Equal Protection Clause, the disqualification denied appellee due process. 408 F. Supp., at 1022. There is, however, no claim of denial of procedural due process, cf. *Mathews* v. *Eldridge,* 424 U. S. 319 (1976), and we are unable to discern the basis for a claim that appellee has been denied substantive due process.

The judgment of the District Court is reversed.

*It is so ordered.*

MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.