**Ward HESTER et al.**

v.

**Vincent J. RIZZO et al.**

**Civ. A. No. 77–916.**

United States District Court,
E. D. Louisiana.

April 20, 1978.

---

Robert M. Hearin, Jr., New Orleans, La., for plaintiffs.

Herbert W. Christenberry, Jr., Philip S. Brooks, City Atty., New Orleans, La., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK M. GORDON, District Judge.

This action arises out of a dispute between certain taxicab drivers and the New Orleans Aviation Board over the use of a "two-line" system employed at the New Orleans International Airport in an effort to supply efficient taxicab service to deplaning passengers at the airport. On behalf of a class of cab drivers which does not include cabs licensed by the City of Kenner, the named plaintiffs assert that the two-line system denies them the equal protection of the law as guaranteed by the Fourteenth Amendment of the United States Constitution. As representatives of a class of all cab drivers who have been or will be issued "airport permits" by the New Orleans Aviation Board, including Kenner cabs, plaintiffs contend that the disciplinary procedures used at the airport are unconstitutional in that they suspend or revoke the airport permits without due process of law.

The class, with its two subparts, seeks declaratory and injunctive relief pursuant to 28 U.S.C. § 1343(3) and (4), and 28 U.S.C. §§ 2201, 2202. The named plaintiffs are also seeking compensatory and punitive damages for alleged violations of their individual rights under 42 U.S.C. § 1983. Plaintiff Ward Hester alleges pendent jurisdiction over a libel and slander claim against defendant Vincent J. Rizzo.

A motion for preliminary injunction was withdrawn by counsel on July 6, 1977. The class, with its two subparts, was certified on August 31, 1977, at which time the issue of liability was severed from that of damages.[1] The parties filed a Stipulation of Facts for resolution of the liability issues presented by the complaint, after which the Court allowed the parties to brief the relevant law before taking the matter under submission. The request for preliminary injunction has been consolidated with the demand for permanent injunction pursuant to Federal Rules of Civil Procedure 65.

### FINDINGS OF FACT

1.

The New Orleans International Airport is operated by the New Orleans Aviation

---

1. Pursuant to a notice posted at the airport, some 111 taxicab drivers opted out of the class represented by Messrs. Hester, Dodds, Porter and Evans in this lawsuit. See, record doc. No. 18.

Board, an agency of the City of New Orleans. The airport is located within the corporate boundaries of the City of Kenner, Parish of Jefferson, and is situated approximately seven and one-half miles due west of the New Orleans city limits. From 1974 through 1976 the airport averaged approximately 4½ million passengers enplaning and deplaning on an annual basis, with about one-half that number being deplaning passengers. Of the approximately two million-plus deplaning passengers at the New Orleans International Airport, approximately 65% used limousines and taxicabs as their means of transportation from the airport to their point of destination. The remaining 35% of the deplaning passengers either made private arrangements or used rental cars.

2.

At present, there are 1,555 taxicabs with airport permits entitling them to use the facilities at the New Orleans International Airport. Airport permits are issued by the New Orleans Aviation Board upon application (unless a compelling reason exists to the contrary) to all taxicab drivers having locally valid Certificates of Public Necessity and Convenience (C.P.N.C.'s) which have been issued by such authorities as the City of New Orleans, the City of Kenner, the Parish of Jefferson and the Parish of St. Charles.[2] Such application contains pertinent professional and personal information regarding the applicant, and includes his mailing address. Of the 1,555 airport permits, all are valid until revoked or suspended by the New Orleans Aviation Board.

3.

Plaintiffs Ward Hester, Rudolph W. Dodds and Joseph L. Porter are residents of the Parish of Orleans, Louisiana; each holds a current airport permit and operates a taxicab pursuant to a C.P.N.C. from the City of New Orleans. Plaintiff Charles Evans resides in the City of Marrero, Parish of

Jefferson, Louisiana; he holds a current airport permit and operates a taxicab pursuant to a C.P.N.C. from the Parish of Jefferson.

4.

Defendant Vincent J. Rizzo is the Deputy Director of the New Orleans Aviation Board; Paul J. Stoulig is the Director of Aviation of the Board; and defendants Glazer, Marshall, Trotter, Meltzer, Smith, Kernion, L'Hoste, Friloux and Landrieu are the individual members of the New Orleans Aviation Board. In the course of their operation of the New Orleans International Airport, these defendants have promulgated various rules and regulations, pertinent numbers of which govern the ingress and egress of taxicabs and their drivers at the airport. Defendant Alton Patterson, at all times pertinent hereto, was employed by the New Orleans Aviation Board as a taxicab "regulator."

5.

One of the rules governing the taxicab drivers provides that all taxicabs awaiting deplaning passenger fares are classified as to whether or not they are long-haul or short-haul. The short-haul line is reserved for fares with point of destination anywhere within the Parish of Jefferson, excepting the cities of Lafitte and Grand Isle. The long-haul line is reserved for fares to the City of New Orleans and beyond. Only taxicabs having a C.P.N.C. issued by the City of Kenner, Louisiana, are allowed to operate from the short-haul line, with taxicabs holding C.P.N.C.'s from other issuing authorities being required to operate from the long-haul line. In the instance where no short-haul taxicab is available, there and only there, the first long-haul taxicab in line is required by the regulation to accept the short-haul fare and, further, is given a slip of paper which entitles the driver thereof to reinstatement at the front of the long-haul line upon his return from taking

---

**2.** In the City of New Orleans there are approximately 1600 taxicabs with C.P.N.C.'s; the City of Kenner has 111 cabs operating with C.P.N. C.'s; the City of Gretna has 250 such cabs, and the Parish of Jefferson (unincorporated portions) has 90 such cabs.

the short-haul fare. The effect of this rule is that Kenner cabs are allowed to work the long-haul line as well as the short-haul line, while all other cabs may choose only the long-haul line at the airport.

6.

Taxicabs seeking fares from deplaning passengers at the New Orleans International Airport often face waits of between three to five hours in order to secure an outbound fare. To facilitate the orderly handling of all the taxicabs in the waiting area, the defendant members of the Aviation Board have employed several persons known as "regulators" (such as defendant Alton Patterson) to act for them insofar as is necessary to implement the regulations outlined above, and to see to it that they are enforced.

When a deplaning passenger steps out of the lower-level baggage area and indicates that he is desirous of obtaining a taxicab, the "regulator" asks the passenger's destination and then gives a signal (one ring of a bell or two rings of a bell) to the waiting taxicab drivers, which signal indicates to them whether the fare is long-haul or short-haul. Upon such signal the first taxicab driver in the appropriate line moves forward, picks up the passenger, and departs the airport grounds.

If a long-haul driver refuses to accept a short-haul fare when requested to do so by the regulator, the regulator is supposed to ask the driver to move on, thus losing his place in line. A written report of the incident is then given to the New Orleans Aviation Board Office, whereupon a decision is made as to whether or not the driver should become subject to disciplinary proceedings in the form of suspension and/or revocation of his airport permit.

7.

Prior to this lawsuit, defendants notified cab drivers of any disciplinary proceedings via personal notice given to them by the regulators on duty at the airport. No written notice of the proceedings was mailed to the cab drivers, nor were they apprised in any way, other than by word of mouth, as to the defendants' policy pertaining to witnesses, continuances, appellate rights and procedure, nor were they given written reasons for the hearing officer's decision relative to their case. Additionally, such rules and regulations as did exist were posted for review only at the two "regulator" posts at the New Orleans International Airport, and they were not mailed out to the cab drivers at any time.

8.

Since the filing of this lawsuit, defendants have instituted new procedures regarding hearings which may result in suspension or revocation of airport permits. Defendants now provide notice of intended disciplinary actions by registered mail, return receipt requested, to the cab driver's address given on his application for his airport permit. Additionally, written reasons for decisions by the hearing officer (usually defendant Vincent J. Rizzo) are now given in addition to notice as to the procedures to be used at such hearing, including the continuance procedure and the appellate process.

9.

On or about January 15, 1977, while operating under the old disciplinary procedures, plaintiff Rudolph W. Dodds was waiting at the head of the long-haul line for an outbound fare when he was requested by a regulator to take a short-haul fare. Because he did not wish to participate in the short-haul line on an involuntary basis, plaintiff Dodds refused the load and followed the regulator's instructions to move on, thus losing his place in line.

As a result of this incident, plaintiff Dodds was later notified by one of the regulators at the airport that he had been scheduled for a hearing before defendant Vincent J. Rizzo with regard to his refusal to take the short-haul fare. Dodds was given the date and time for the hearing. Due to a death in his family, plaintiff Dodds was called to Chicago, Illinois, and was thus unable to attend the scheduled hearing, which resulted in a ten-day suspen-

sion of his airport permit. Since Dodds did not request a continuance of such hearing, it was held in his absence, but, upon his return from Chicago two weeks after the suspension order, he was advised as to the disposition of the hearing, and that his permit was no longer suspended.

Plaintiff Dodds operates his taxicab at the New Orleans International Airport infrequently, spending less than one-fourth of his working time at the airport picking up deplaning passengers.

## 10.

On or about Friday, February 18, 1977, also while operating under the old disciplinary procedures, plaintiff Ward Hester was awaiting a long-haul fare when summoned by regulator Alton Patterson (a defendant herein) to take a short-haul fare. Upon Hester's refusal to participate in a short-haul line on an involuntary basis, he was asked to move on by regulator Alton Patterson, and given "time-off" over that weekend, with permission to return given by defendant Patterson on Monday, February 21, 1977. At the same time, defendant Patterson made a written report of plaintiff Hester's actions, and this report was the subject of a hearing on or about March 9, 1977.

## 11.

Plaintiff Hester, accompanied by an attorney, was present at his March 9, 1977, post-suspension hearing, where he explained his refusal of the short-haul fare. Defendant Rizzo told Hester that the actions of regulator Alton Patterson were not authorized by him or by the Board, and that they were *ultra vires* to a regulator's job description. Defendant Rizzo then decided that no further action in the matter need be taken, and that the case was closed. Notwithstanding a request therefor, plaintiff Hester was denied compensation for the three days he stayed away from the New Orleans International Airport. The proceedings at the hearing were informal, and at one point in the hearing Rizzo referred to Hester as a "fool" for not having accepted the short-haul fare.

## 12.

Under both the old and the new disciplinary proceedings there is no specific procedure for notice or hearing prior to a regulator's returning a cab driver to the end of the long-haul line for refusing a short-haul fare. There is no postponed hearing on the incident unless the refusal is considered grounds for a possible suspension or revocation of the cab driver's airport permit. In that event a hearing date is set and the driver is notified thereof.

## 13.

Prior to the two-line cab system being set up by the defendants, the traveling public was at times inconvenienced, at times even harassed and abused by cab drivers who refused to pick up what are now the short-haul fares. The system as it now exists was designed by the New Orleans Aviation Board to alleviate this troublesome situation, and thus to provide better cab service to deplaning passengers. The two-line system had been in effect for a number of years prior to the filing of this lawsuit.

## CONCLUSIONS OF LAW

### I.

The Court has jurisdiction of the 42 U.S.C. § 1983 claims pursuant to 28 U.S.C. § 1343(3) and (4), with jurisdiction to provide declaratory or injunctive relief, if warranted, under 28 U.S.C. §§ 2201, 2202. With respect to the class action claims, relief is grounded in allegations of denial of equal protection and due process. These grounds shall be treated successively.

### A. EQUAL PROTECTION

The class subpart which consists of all taxicab drivers excluding Kenner cabs asserts that the two-line system, as it is presently constructed, denies them equal protection under the law in that the system arbitrarily discriminates against them in deference to taxicabs with C.P.N.C.'s issued by the City of Kenner, Louisiana. Plaintiffs

argue that the present system serves to strengthen the economic livelihood of the operators of Kenner cabs to the detriment of the plaintiffs, and that the system is arbitrary and capricious.

It should be noted that plaintiffs do not challenge the need for a two-line system, per se, but rather they specifically object to the peculiar geographical construction and eligibility requirements that this two-line system presently operates under. In other words, plaintiffs challenge the two-line system only insofar as it discriminates against a class of non-Kenner taxicabs.

■ Since the regulation in dispute does not involve any discernible fundamental interest or affect with particularity any protected class, the test of constitutionality, therefore, is whether the regulation has a rational relation to a legitimate state interest. *Ohio Bureau of Employment Services v. Hodory,* 431 U.S. 471, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977); *City of New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976). The "rational relation" analysis, as it is applied in the area of economic regulation, was outlined in *City of New Orleans v. Dukes,* as follows:

> When local economic regulation is challenged solely as violating the Equal Protection Clause, this Court consistently defers to legislative determinations as to the desirability of particular statutory discriminations. See, e. g., *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973). Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest. States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less

than mathematical exactitude. Legislatures may implement their program step-by-step, *Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), in such economic areas, adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations. See, e. g., *Williamson v. Lee Optical Co.,* 348 U.S. 483, 488–489, 75 S.Ct. 461, 464–65, 99 L.Ed. 563 (1955). In short, the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines, see, e. g., *Day-Brite Lighting, Inc. v. Missouri,* 342 U.S. 421, 423, 72 S.Ct. 405, 407, 96 L.Ed. 469 (1952), in the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment. See, e. g., *Ferguson v. Skrupa,* 372 U.S. 726, 732, 83 S.Ct. 1028, 1032, 10 L.Ed.2d 93 (1963). (96 S.Ct. at 2516)

■ The interest sought to be promoted by the defendants in this case is the efficient, effective and courteous provision of cab service to travelers deplaning at the New Orleans International Airport. In light of the fact that vast numbers of passengers are deplaning at the airport annually, and the further fact, stipulated to by the plaintiffs, that what are now considered short-haul fare passengers were oftentimes harassed and abused by cab drivers who refused to give them service, it can easily be seen that an untenable situation could quickly arise were the *cabs* allowed to be "wholly arbitrary" in deciding which deplaning passengers they would pick up. Therefore, it is certainly a legitimate purpose of the Aviation Board to seek to streamline its taxicab service so as to be at its most efficient and profitable for all concerned, both the cab drivers and the passengers.[3]

---

**3.** Rights and privileges do not exist in a vacuum. Therefore, in considering the constitutionality of the regulation, the Court must view its

consequences, not only for the cab drivers, but also for the traveling public, who are affected by its existence. See *Ohio Bureau of Employ-*

In essence, the plaintiffs do not contest the legitimacy of the Board's purpose in forming the two-line system, for they do not challenge the two-line system in and of itself, but only the geographical distinctions which are drawn in deciding who may work the "long" line or the "short" line. It is these distinctions, say the plaintiffs, that constitute "the wholly arbitrary act" which cannot stand consistently with the Fourteenth Amendment in matters of local economics. *City of New Orleans v. Duke, supra,* at 96 S.Ct. 2516, citing *Ferguson v. Skrupa,* 372 U.S. 726, 732, 83 S.Ct. 1028, 1032, 10 L.Ed.2d 93 (1963). Therefore, plaintiffs do not argue or contend that the asserted purpose of the Board is not legitimate, but rather that its means are not rationally related to that purpose.

In support of this argument, plaintiff contends that the area of passenger destination served by the short-haul line, namely the whole of Jefferson Parish, excepting Lafitte and Grand Isle, gives to Kenner cabs fares which are as long as, if not longer than, many long-haul fares, all the while precluding other non-Kenner Jefferson cabs (such as plaintiff Charles Evans operates) from obtaining non-Kenner Jefferson fares. Plaintiffs suggest that a more rational system would retain the two lines but either limit short-haul fares to those going to the City of Kenner only, or allow non-Kenner cabs to also work the line of their choice.

In *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), the Court stated at 397 U.S. 485, 90 S.Ct. 1161:

> In the area of economics and social welfare, a state does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it does not offend the Constitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality. . . . The problems of government are practical ones and

may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific. . . . (Citations omitted.)

Although the plaintiffs recognize this principle, they contend that the present geographical restrictions of the two-line system at the airport are no mere "imperfections," but are rather, gross examples of "wholly arbitrary" actions on the Board's part. This Court simply cannot agree. To the extent that any decision-making body must draw lines of demarcation, it cannot escape being arbitrary to a degree. But there was a reasonable basis for the over-all decision that was made here, despite plaintiffs' arguments to the contrary.

■ The defendants found, and plaintiffs concede, that when all cabs were free to choose which fares they wished to accept, there was an abusive situation in which short-haul fare passengers were denied cab service and even harassed by the cab drivers. It was reasonable to feel, as the Board did feel,[4] that Kenner-based taxis would be more amenable to accepting the short-haul fares, and would be more likely than non-Kenner cabs to give efficient, courteous service to local fares. By eliminating any competition for the Kenner cabs, the Board encouraged what they perceived to be a natural tendency of these cabs. That the geographic area served by the short-haul line could be improved, or that its operative effect results in some inequality, does not make the system constitutionally infirm under *Dandridge v. Williams, supra.* Accordingly, the request for declaratory and injunctive relief on this ground is DENIED.

## B. DUE PROCESS

The class subpart which consists of all cab drivers who have been or will be issued airport permits, including Kenner cabs, contends that the disciplinary procedures at the airport violate the Fourteenth Amendment's guarantee against deprivation of property without due process of law. Spe-

---

*ment Services v. Hodory, supra,* at 97 S.Ct. 1909.

4. See, defendants' Memorandum of Law, p. 3, record doc. No. 20.

cifically, plaintiffs argue that their airport permits are "property," within the meaning of the Fourteenth Amendment, and they may not be deprived thereof, even temporarily, without proper notice and a hearing. Since the procedures for notice and hearing in general have been changed by the defendants subsequent to the filing of this action, the issue is now moot except to the extent that any due process rights are being violated by the regulators' removal from the head of the long-haul line, without prior notice and hearing, those cab drivers *who refuse to accept a short-haul fare upon request.*

■ The plaintiffs are correct in their assertion that their airport permits are "property" within the meaning of the Fourteenth Amendment. Such items as permits, driver's licenses, and certificates of public convenience and necessity qualify as property interests for purposes of procedural due process. *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Wells Fargo Armored Service Corp. v. Georgia Public Service Commission,* 547 F.2d 938 (5th Cir. 1977). As such, even a temporary deprivation of the permit, in the form of a suspension, constitutes a "deprivation" within the meaning of the Fourteenth Amendment. *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 1986, 32 L.Ed.2d 556 (1972); *Bell v. Burson, supra.* It is the position of the plaintiffs that when they are removed from the head of the long-haul line and forced to endure an additional three-to-five-hour wait to get a fare, this operates, by analogy, as a "suspension" of their airport permit. This Court cannot accept such an analogy.

■ When a "recalcitrant" cab driver is removed from the head of the line, what he is being deprived of is not his permit, or even the use of his permit, but of his place in the line. The cab driver retains his airport permit, he is allowed to use the permit by reentering the line, and there is no suspension or revocation of the permit until after a hearing is held on the refusal to accept a short-haul fare. The due process clause protects only against a deprivation of

liberty or property interests, and the cab drivers do not have a "property interest" in their place in the line, but only in their airport permits. Since only the driver's place in line and not the permit has been affected by the removal, the Court finds that there has been *no* deprivation in the constitutional sense, and therefore DENIES the declaratory and injunctive relief requested by the class.

## II.

With respect to the individual claims for damages, the named plaintiffs have all sued under 42 U.S.C. § 1983 for violations of their personal due process rights. Each plaintiff will be treated in turn.

### A. PLAINTIFFS PORTER AND EVANS

■ In their amended complaint, Joseph L. Porter and Charles Evans prayed for both compensatory and punitive damages against the defendants. However, neither Porter nor Evans has submitted to this Court any evidence, nor have they made any legal argument in connection with the stipulated facts, on which this Court could find any of the defendants liable to them in damages of any kind. Accordingly, the claims of these plaintiffs for monetary damages are hereby DENIED.

### B. PLAINTIFFS RUDOLPH W. DODDS AND WARD HESTER

As set forth above in the Findings of Fact, Rudolph W. Dodds refused to take a short-haul fare when requested to do so on January 15, 1977, and was thereafter subjected to disciplinary procedures which resulted in a ten-day suspension of his airport permit. The issue for this Court to decide is whether, under the facts stipulated to by the parties and made part of the Court's findings of fact herein, the defendants, or any of them, are liable in damages to Mr. Dodds for a violation of his due process rights under the Fourteenth Amendment. For the reasons which follow, the Court finds in favor of the defendants on this issue.

Subsequent to his refusal to take the short-haul fare, Rudolph Dodds was given oral notice by an unnamed airport regulator that he was scheduled for a hearing before defendant Rizzo with regard to his refusal to take the fare. In addition to being notified of the charges against him, Dodds was given the date and time for the hearing. Prior to the scheduled hearing, Dodds was called out of town unexpectedly, due to a death in his family. He did not request that the hearing be continued and thus, it was held without him, and resulted in a ten-day suspension of his airport permit. Dodds did not return to New Orleans until after his suspension was over, at which time he was notified of the suspension, and that it was no longer in effect.

■ Plaintiff's argument is two-pronged: first, that the notice of the hearing should have been written and not oral; second, that the hearing should not have been held without him. In support thereof, plaintiff relies on only one case, *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

The due process clause of the Fourteenth Amendment provides:

> . . . nor shall any State deprive any person of life, liberty, or property, without due process of law; . . .

This clause "raises no impenetrable barrier to the taking of a person's possessions," or liberty, or life. *Fuentes v. Shevin,* 407 U.S. 67, 81, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972). Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property. Thus, in deciding what process constitutionally is due in various contexts, the Court repeatedly has emphasized that "procedural due process rules are shaped by the risk of error inherent in the truth-finding process . . . ." *Mathews v. Eldridge,* 424 U.S. 319, 344, 96 S.Ct. 893, 907, 47 L.Ed.2d 18 (1976). Such rules "minimize substantively unfair or mistaken deprivations of" life, liberty, or property by enabling persons to contest the basis upon which the state proposes to deprive them of protected interests. *Fuentes v. Shevin, supra,* 407 U.S. at 81, 92 S.Ct. at 1994.

In order to protect against mistaken or unfair deprivations of property, due process, therefore, requires adequate notice and an opportunity to be heard. The Court in *Mullane v. Central Hanover Bank & Trust Co.,* on which plaintiff relies, explained the requirement for adequate notice at 339 U.S. 314, 70 S.Ct. 657:

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. . . . The notice must be of such nature as reasonably to convey the required information, . . . and it must afford a reasonable time for those interested to make their appearance, . . . But it with due regard for the practicalities and peculiarities of the case these conditions are reasonably met the constitutional requirements are satisfied. . . . (Citations omitted.)

The requirement for adequate notice is inextricably tied in with the notion that one may not be deprived of one's property without first being given an opportunity to contest the basis for the deprivation. For as the Court in *Mullane* stated, also at 339 U.S. 314, 70 S.Ct. 657:

> The fundamental requisite of due process of law is the opportunity to be heard. . . . This right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest.

The *Mullane* Court thus saw the end to be achieved as that of "actual and personal notice," and, therefore, established the rule "that within the limits of practicability notice must be such as is reasonably calculated to *reach* interested parties." 339 U.S. at 318, 70 S.Ct. at 659 (emphasis added). Accordingly, the *Mullane* decision struck down a provision for notice by publication in newspapers when the addresses of those

parties to be notified were available to the defendants. The Court felt that written notice sent by mail was more reasonably calculated to *reach* the interested parties than a notice in the newspaper would be. The constitutional infirmity arises, not when the notice which a person receives is not written, but when he does not receive it.

Plaintiff Dodds is not arguing that he did not receive any notice of his hearing, or that the content of the notice was inadequate to apprise him of the charges against him in order for him to prepare a sufficient defense. He argues that his due process rights were violated solely because his notice was not written. Plaintiff has cited to this Court no authority which requires that, in these circumstances, written notice is mandatory, where adequate oral notice was actually received. What due process requires is fairness, i. e., that a party receive actual personal notice of a future hearing which may result in a termination, albeit a temporary one, of his property rights; and that such notice adequately inform him of the charges against him in such a fashion as to permit him to prepare a competent defense. Where oral notice is direct, and conveys as much information as a written notice could have, and there is nothing complicated or otherwise unusual about the substance of the communications which would press for written transmittal, then oral notice is adequate for due process purposes. *Rost v. Hocky,* 422 F.Supp. 615 (D.Nev. 1976).

As for the plaintiff's contention that the holding of the disciplinary hearing without him also violated his right to due process, what *Mullane* recognizes as fundamental is the *opportunity* to be heard, and not that the party actually *be* heard. As the *Mullane* Court noted, the aggrieved party "can choose for himself whether to appear or default, acquiesce or contest." Therefore, so long as a plaintiff knew of the hearing and of its purpose, and was given the opportunity to attend and present his case, it has been held that he cannot complain when he refuses to attend and his rights are terminated without him. See, *Birdwell v. Hazelwood School District,* 491 F.2d 490 (8th Cir. 1974). In the instant case, it has been stipulated that plaintiff Dodds did not request a continuance of his hearing, or otherwise inform defendants of his inability to appear. Plaintiff has neither alleged nor proved that he was unaware that he could request a continuance or that a continuance procedure was entirely unavailable. Under the totality of the circumstances, plaintiff cannot now be heard to complain that his due process rights were violated, and accordingly, the Court finds in favor of defendants with respect to the claim for damages of Rudolph W. Dodds.[5]

However, the claim for individual damages on behalf of Ward Hester appears to be well-founded. Hester was effectively suspended from using his airport permit from February 18, 1977, until February 21, 1977, without the opportunity for a prior hearing. This was not an emergency situation, such as to necessitate suspension without a hearing, and there was no reason why the normal procedure of removal from the head of the line, with notice and a suspension hearing to follow, should not have been employed. If the right to notice and a hearing is to serve its full purpose, then it must be granted at a time when the deprivation can still be prevented. *Fuentes v. Shevin, supra,* at 407 U.S. 79, 92 S.Ct. 1994. This means that an individual must be given an opportunity for a hearing *before* he is deprived of a property interest, except in extraordinary circumstances where an over-

---

5. The Court does not intend for this opinion to act as a comment on the constitutionality of an oral notice system per se. *Mullane* requires a notice system reasonably calculated under all the circumstances to reach the interested party. Obviously, a system whereby notice is given solely by word of mouth does not comport with the requirements of *Mullane,* for the likelihood that, in some cases, parties will never receive their notice until it is too late is great. However, in assessing whether an individual plaintiff's due process rights were violated, it is only necessary that the Court look to see if he actually received timely notice. If he did, then the possibility that he might not have, is irrelevant.

riding governmental interest is at stake that justifies postponing the hearing until after the event. See, *Remm v. Landrieu,* 418 F.Supp. 542 (E.D.La.1976).

■ Having made out a prima facie case of denial of due process, defendants have not rebutted Mr. Hester's facts with any overriding reason why a prior hearing should not have been accorded him. Defendant Alton Patterson was acting under the color of his authority as an airport regulator when the violation occurred, and is, therefore, personally liable for whatever actual damages Mr. Hester may be able to prove. However, since plaintiff has not presented any evidence of malice or ill will in Patterson's conduct, his request for punitive damages is unfounded and, therefore, denied. Additionally, in the event that plaintiff is unable to prove any actual damages, he is entitled to recover nominal damages, not to exceed the sum of one dollar. *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).

Plaintiff has not proven that any of the other named defendants, by their *own* conduct, effected his weekend suspension without a prior hearing, and, therefore, he is not entitled to relief from anyone other than Alton Patterson. See, *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

### III.

Ward Hester has also alleged that defendant Vincent J. Rizzo is liable to him in damages for libel and slander under Louisiana law. Since there is no diversity of citizenship, jurisdiction to entertain this claim, if any, arises under the doctrine of pendent jurisdiction. Although this issue was not formally submitted to the Court for resolution with the constitutional claims, in the interest of judicial economy, the Court feels it best to dispose of the libel action at this time for the reason that it finds itself without jurisdiction to entertain the state claim further.

■ Subject matter jurisdiction may be raised at any time, even by the Court on its own motion. In *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) it was held that whenever the Court has jurisdiction because of a substantial federal claim, there is power to hear pendent claims if they derive from a common nucleus of operative fact and if the claims are such that a plaintiff would ordinarily be expected to try them all in one judicial proceeding. In Mr. Hester's case, the libel claim does not derive from a "nucleus of operative fact" common with the federal claims although it does derive from the same event. From a reading of facts, liability, if any, must be presumed to have arisen when Rizzo called Hester a "fool" at the March 9th hearing. However, the constitutional claim turned on the fact that Hester was suspended on February 18, 1977, without notice and opportunity for a prior hearing. Additionally, the libel claim is not one which would ordinarily be expected to be tried with the federal claims. *PAAC v. Rizzo,* 502 F.2d 306 (3d Cir. 1974), cert. denied 419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804.

Therefore, finding itself to be without jurisdiction to entertain the state law claim of Ward Hester, the Court hereby ORDERS that the same be and is hereby DISMISSED.

ACCORDINGLY, IT IS ORDERED that judgment be entered consistent with this opinion, with a TRIAL on damages for the 42 U.S.C. § 1983 claim of Ward Hester to be set for a future date.